**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MARIE CADET,<br>*Plaintiff*,<br><br>v.<br><br>H.N.S. MANAGEMENT COMPANY, INC., d/b/a CT TRANSIT and AMALGAMATED TRANSIT UNION LOCAL 443<br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 3:24-CV-01785 (SVN)<br><br><br><br><br><br>September 30, 2026 |

**RULING AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**

Sarala V. Nagala, United States District Judge.

In this hybrid action brought under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, Plaintiff, a former bus operator, sues her former employer, H.N.S. Management Company, Inc., d/b/a CT Transit ("CT Transit") and union, Amalgamated Transit Union Local 443 ("the Union" or "Local 443") (together, "Defendants"), for breach of a collective bargaining agreement and breach of the duty of fair representation, respectively. Both Defendants seek summary judgment, claiming that no reasonable jury could find that the Union violated its duty of fair representation. Defendant CT Transit additionally contends that no reasonable jury could find that it violated its collective bargaining agreement as to Plaintiff. For the reasons described below, the Court GRANTS both Defendants' motions.

## I. HYBRID ACTIONS UNDER § 301 OF THE LABOR MANAGEMENT RELATIONS ACT

The Labor Management Relations Act of 1947 created a federal regulatory structure for "labor relations affecting commerce through the means of collective bargaining." *Ass'n of Westinghouse Salaried Emp. v. Westinghouse Elec. Corp.*, 348 U.S. 437, 462 (1955) (Reed, J., concurring). The Act "sets forth guiding principles which will bear on contracts made under it,

and it also controls the machinery for reaching those agreements," such that collective bargaining agreements must be entered into in accordance with federal law. *Id.* Section 301 of the Act grants federal jurisdiction over disputes relating to collective bargaining agreements, making breach of such agreements actionable. *See* 29 U.S.C. § 185(a) ("Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties . . .").

"Ordinarily . . . an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement" before bringing a § 301 claim. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163–64 (1983) (citing *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965)); *cf. Clayton v. Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am.*, 451 U.S. 679, 685 (1981). But the Supreme Court has recognized that the exhaustion requirement "works an unacceptable injustice" against an employee where the union representing them "acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation." *DelCostello*, 462 U.S. at 164. In such circumstances, an employee may bring a "hybrid" suit under § 301 against both the employer and the union, "notwithstanding the outcome or finality of the grievance or arbitration proceeding." *Id.* (citing *Vaca v. Sipes*, 386 U.S. 171 (1967) and *Hines v. Anchor Motor Freight*, 424 U.S. 554 (1976)); *see also Smith v. Cont'l AFA*, 562 F. Supp. 2d 283, 290 (D. Conn. 2008).

Accordingly, an employee asserting a "hybrid" claim against his or her union and the employer must allege both that "the employer breached a collective bargaining agreement" and that the union "breached its duty of fair representation in redressing her grievance against the employer." *White v. White Rose Food*, 128 F.3d 110, 113 (2d Cir. 1997). Additional relevant legal principles are set forth below.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Collective Bargaining Agreement and the Bus Operator Handbook

The following facts are undisputed except where noted.[1]

Defendant HNS Management Company, Inc. contracts with the Connecticut Department of Transportation to operate the public bus system known as CT Transit. CT Transit L.R. 56(a)1 St., ECF No. 52 ¶ 1. Bus operators employed by CT Transit, including Plaintiff during her employment, are represented by the Amalgamated Transit Union ("ATU"). Union L.R. 56(a)1 St., ECF No. 49-2 ¶ 5. The Hartford, New Haven, and Stamford Divisions of CT Transit each have their own local union, and the three local unions operate under a single collective bargaining agreement with CT Transit. ECF No. 52 ¶ 2. Plaintiff was a member of Labor Union Local 443, ATU, during her employment with CT Transit. *Id.* ¶ 4. The terms and conditions of her employment were governed by the collective bargaining agreement ("CBA") negotiated by the ATU and CT Transit. ECF No. 49-2 ¶ 8; Pl.'s Add'l Mat. Facts, ECF No. 63 ¶ 6. For purposes of this action, the relevant CBA is the agreement governing the period from April 1, 2022, through March 31, 2025. CBA, ECF No. 49-5 at 7–144.

The CBA provides that CT Transit has the "exclusive right to set its policy," including "to make reasonable rules and regulations governing the operation of its business and the conduct of its employees; to enforce discipline for violation of rules and other misconduct; [and] to suspend or discharge its employees for cause." ECF No. 49-2 ¶ 14; ECF No. 49-5 at 14. The CBA further

[1] Plaintiff's Local Rule 56(a)2 Statements do not comply with the Local Rules. *See* D. Conn. L. Civ. R. 56(a)1–2; ECF Nos. 61 (CT Transit L.R. 56(a)2 St.), 62 (Union L.R. 56(a)2 St.). Such statements are required to "include a reproduction of each numbered paragraph in the moving party's Local Rule 56(a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact." D. Conn. L. Civ. R. 56(a)2. Plaintiff's L.R. 56(a)2 Statements provide only a response to each Defendant's Rule 56(a)(1) statements without reproducing their content, resulting in unnecessary expenditure of judicial resources spent comparing Plaintiff's Statements to Defendants' Statements. Accordingly, for ease of reference, the Court primarily cites to Defendants' Local Rule 56(a)(1) statements, and references Plaintiff's Rule 56(a)2 statements only where necessary to describe disputed facts.

provides that "[n]o employee may be discharged except for cause." ECF No. 49-5 at 96; *see also* ECF No. 61 ¶ 14.

CT Transit also maintains a Bus Operator Handbook (the "Handbook"), separate from the CBA, which outlines the responsibilities of bus operators and sets forth regulations for the operation of its transit buses. ECF No. 49-2 ¶ 15. The Handbook contains a Discipline Code for Bus Operators, which sets forth disciplinary procedures for violations of those policies. *Id.* Violations are grouped into four categories, with the most serious violations falling in Category 1. CT Transit Bus Operator Handbook, ECF No. 49-6 at 143–47.

Any Category 1 violation—such as stealing from the company, tampering with a farebox, physically assaulting any person, or operating a company vehicle while under the influence or alcohol or drugs—results in immediate discharge. *Id.* at 143–44.

Category 2 violations, which include using or having a cellular phone on while in service, result, at a minimum, in suspension and a final warning; depending on the "nature and severity" of the violation, one Category 2 offense may result in dismissal. *Id.* at 144–45. If a suspension, rather than discharge, is imposed for a first Category 2 offense, any second violation "will normally result in immediate discharge." *Id.* One Category 2 offense, use of a cellular phone, has its own disciplinary structure: the first offense results in a five-day suspension; the second offense in a ten-day suspension; and the third offense in termination of employment. *Id.* at 145.

Category 3 violations, which include violation of traffic laws and "[e]ating, drinking, smoking, or chewing tobacco on bus while in operation," "will normally subject the employee to progressive discipline, up to and including discharge," with management considering "the nature and extent of individual violations" and "the employee's overall record," among other factors. *Id.* at 145–46. A first violation may include a warning or suspension; two violations may result in

suspension and possible final warning; three violations may result in a lengthy suspension, final warning, or discharge; and four violations results in discharge. *Id.*

Finally, Category 4 violations, which include failure to observe rules of safe and courteous bus operation, will subject employees to progressive discipline, "up to and including discharge for repeated violations during a 12-month period." *Id.* at 146. One violation will generally result in counseling and warning; two violations may result in either a warning or a suspension, three violations will result in suspension, four violations will result in suspension, final warning, or discharge, and five violations will result in discharge. *Id.*

Importantly, the Discipline Code affords some measure of discretion to CT Transit's management in determining appropriate discipline. The Discipline Code permits immediate suspension or discharge in cases of serious misconduct, repeated violations of the same rule, or multiple rule violations. *Id.* at 142. ("This code is designed to serve as a guide to employees and management for the purpose of ensuring that disciplinary matters are handled consistently and fairly . . . [but] is not intended to impose a rigid limitation on management when dealing with disciplinary matters. When disciplinary action is necessary, the employee's total record will be considered before determining any penalty. For violations of multiple rules occurring during the same time period, penalties will be determined at the discretion of management."). The Discipline Code also provides that employees may face discipline for actions not specifically listed in the

Discipline Code if they are "detrimental to the mission of CT Transit." ECF No. 49-6 at 143.[2] The Discipline Code further provides that "[m]ajor or willful infraction of rules and/or instructions or the continued necessity to administer discipline shall be sufficient cause for the discharge of any employee." *Id.*

The CBA further establishes a grievance and arbitration procedure for Union employees. ECF No. 49-2 ¶ 9. An employee who has been discharged, suspended, or otherwise disciplined may file a Step 1 grievance with CT Transit within ten days of the date of discipline. *Id.* ¶ 9. Within fifteen days of receiving a Step 1 request, a CT Transit assistant general manager issues a written decision on the grievance; if such decision is deemed unsatisfactory, the Union may submit a Step 2 grievance appeal. *Id.* ¶¶ 10–11. A CT Transit general manager (or general manager's designee) then issues a written decision on the Step 2 grievance appeal. *Id.* ¶ 12. If the grievance remains unresolved, either CT Transit or the Union may submit the matter to binding arbitration through the American Arbitration Association. *Id.* ¶ 13. The Union maintains its own internal procedure to determine whether to exercise its right to submit the matter to arbitration. *Id.* ¶ 64.

[2] In its Local Rule 56(a)(1) statement, Defendant CT Transit paraphrases the Discipline Code as "provid[ing] that disciplinary action for rule violations is generally progressive, taking into account the frequency and severity of the infraction, but also permits immediate suspension or discharge in cases of serious misconduct, repeated violations of the same rule, or multiple rule violations," and "emphasiz[ing] that Bus Operators . . . 'may be subject to discipline—even for actions not explicitly listed in the Discipline Code—if those actions are detrimental to CT Transit's mission.'" ECF No. 49-2 ¶¶ 17–18. In her Local Rule 56(a)2 statement, Plaintiff denies these statements as factually untrue. ECF No. 61 ¶¶ 17–18 ("The Bus Operator Handbook sets forth a progressive disciplinary code based on categories of violations requiring multiple violations before discharge as applied to Plaintiff's alleged violations in the instant case. . . the disciplinary policy indicates that employees will normally be subject to increasingly severe penalties in a progressive manner."). The Court has carefully reviewed the CBA and the Discipline Code and has endeavored to accurately summarize its provisions above. The Court finds that Plaintiff's dispute with CT Transit's statements in paragraphs 17 and 18 of its Local Rule 56(a)1 Statement is generally not "factual" in nature, but rather consists of semantic differences. And to the extent Plaintiff asserts, as a matter of fact, that the Discipline Code strictly requires "multiple violations before discharge," the Court disagrees. The Discipline Code specifically states that a single Category One violation can result in discharge, and penalties may be determined at the discretion of management. ECF No. 49-6 at 142–43.

B. Plaintiff's Employment and Disciplinary Proceedings

Plaintiff was employed as a bus operator with CT Transit from November 9, 2014, until her termination on April 10, 2024. ECF No. 49-2 ¶ 1; ECF No. 63 ¶ 1. At all relevant times, Plaintiff was a dues-paying member of the Union. ECF No. 63 ¶ 5; ECF No. 49-2 ¶ 7.

*1. Plaintiff's First Termination*

The events relevant to the present dispute began in October of 2023, when Plaintiff received two warnings for her conduct on the job. ECF No. 49-2 ¶ 28. First, Plaintiff was issued a written warning for a "Safe/Courteous Bus Operation" infraction. *Id.* ¶ 29. The violation report states that Plaintiff closed the rear door of the bus "without checking whether someone was standing between them or whether someone got off safely. Then she departed the bus while distracted talking to a female passenger. Had she checked the right-mirrors, she would have noticed the passenger falling exiting through the rear doors. Additionally, the bus was too far from the curb." Operator Violation Rep., ECF No. 49-7 at 2. This was documented as a Category 4 violation. *Id.*

Second, Plaintiff was issued a written warning for a "Unnecessary Conversation/Visitation" infraction. ECF No. 49-2 ¶ 30. The violation report states that Plaintiff "allowed herself to be distracted by having an extended conversation with a passenger" and again closed the rear doors "without checking whether someone was standing between them or whether someone got out through." Operator Violation Rep., ECF No. 49-7 at 4.[3] This, too, was documented as a Category 4 violation. *Id.*

[3] Plaintiff denies that she received these violation reports and states she did not sign them, but does not deny either that she committed the infractions or that a record was made of it. ECF No. 61 ¶¶ 29–30. Both documents are signed with illegible signatures in the appropriate box to indicate that the employee acknowledged receipt of the violation report. ECF No. 49-7 at 2, 4. In the place on each form where the employee could "decline[] to sign in our presence," the forms are blank. *Id.*

On November 10, 2023, CT Transit received a customer complaint alleging that one of its bus operators had a conversation on her cell phone and played music while operating a bus. ECF No. 49-2 ¶ 31. CT Transit reviewed surveillance footage from that day and determined that Plaintiff was the bus operator in question, and that she had committed the actions alleged by the customer, resulting in four safety violations. *Id.* ¶ 33. Plaintiff disputes that she committed the violations and denies that the surveillance video substantiated the customer complaint, but the record reflects that violation reports were issued in relation to violations of CT Transit's cell phone policy. ECF No. 61 ¶¶ 31–33; ECF No. 63 ¶ 44; Operator Violation Rep., ECF No. 49-7 at 9 (documenting a Category 2 violation for cell phone use while the bus was in motion); Operator Violation Rep., ECF No. 49-7 at 11 (documenting a Category 2 violation for cell phone use while the bus was in the Stamford Bus Terminal with passengers loaded).

Apparently through review of the same surveillance footage, CT Transit also determined that Plaintiff ran five red lights, ignored three stop signs, failed to use a turn signal while operating the bus, and executed a hazardous right-hand turn, all on the same morning. ECF No. 49-2 ¶¶ 36–37; Operator Violation Rep., ECF No. 49-7 at 13 (documenting a Category 3 violation for violation of traffic laws); Operator Violation Rep., ECF No. 49-7 at 15 (documenting a Category 4 violation for unsafe bus operation relating to a hazardous right turn). Plaintiff admits the operator violation reports were issued but denies that the violations occurred. ECF No. 61 ¶ 36–37. Superintendent of Safety & Trainings Jean Florian issued the violation reports and later signed a letter dated November 28, 2023, recommending Plaintiff's termination as a result of these violations. ECF No. 63 ¶ 45; Rec. for Termination, ECF No. 49-5 at 150. The letter stated that Plaintiff engaged in "a clear and consistent pattern of safety violations," including disobeying traffic signals and "engaging in distracting behaviors." *Id.* CT Transit terminated Plaintiff's employment effective

December 1, 2023. ECF No. 49-2 ¶ 38. Union President Veronica Chavers attended the termination meeting. *Id.* ¶ 55.

After the December 1 termination, the Union filed a grievance on Plaintiff's behalf, which was advanced to Step 2 and eventually resulted in a settlement providing for Plaintiff's reinstatement after a five-day suspension. *Id.* ¶ 39; ECF No. 52 ¶ 7. As part of the settlement, Plaintiff was also placed on a "Last Chance Agreement" dated January 16, 2024, which provided that Plaintiff would be required to complete a minimum of eight hours of retraining and that "[a]ny future violation of Company rules regarding cell phones will result in immediate termination." ECF No. 49-2 ¶¶ 39–40; ECF No. 52 ¶ 7; Last Chance Agreement, ECF No. 49-7 at 17. Plaintiff thereafter continued working as a bus operator for CT Transit. ECF No. 49-2 ¶ 40.

*2. Plaintiff's Second Termination*

On March 5, 2024, CT Transit received a customer complaint that a bus operator had been "rude," and initiated an investigation into the complaint. ECF No. 49-2 ¶¶ 41–42. As part of the investigation, CT Transit reviewed surveillance footage. *Id.* ¶ 45. Due to an error with certain video timestamps, CT Transit inadvertently reviewed footage that did not correspond to the customer complaint. *Id.* ¶¶ 46. The reviewed video from March 5, 2024, included footage of Plaintiff fastening her seatbelt and securing the driver partition after beginning to drive her bus, eating a container of food while operating the bus, and taking one or both hands off the steering wheel on multiple occasions to eat, adjust her shoes, or adjust her seatbelt. *Id.* ¶¶ 47–52;

Surveillance Video, ECF No. 49-5 at 151–52.[4] Plaintiff denies committing some of these safety violations. ECF No. 61 ¶¶ 47–52.

The video shows Plaintiff getting into a bus and beginning to drive, then reaching to fasten her seatbelt. Plaintiff operates the bus for approximately 13 seconds before her seatbelt is fully fastened. Surveillance Video, 00:45–01:01. While Plaintiff buckles her seatbelt, she removes one hand, then both hands, from the wheel. *Id.* Plaintiff is also shown repeatedly taking one or both hands off the wheel throughout the video, while the bus is stopped and while she is driving. *See, e.g.*, *id.* at 01:05–01:35 (removing one or both hands from the wheel, apparently to retrieve driving gloves from a pocket), 01:40–2:50 (removing one or both hands from the wheel to put on driving gloves and shoes); 3:15–3:20 (removing one hand from the wheel to loosen and adjust seatbelt); 3:40–3:55 (removing both hands from the wheel to loosen and adjust seatbelt); 3:55–8:00, 8:25–9:28 (removing both hands to retrieve food container, driving while eating, and holding container with one hand and steering wheel with the other). For most of the video, Plaintiff is seen holding a food container and eating while driving. *See id.* 3:55–9:28.

Plaintiff contends that she did not commit "multiple safety violations" on March 5, 2024, ECF No. 61 ¶ 47, but does not contest that she ate a bowl of food while operating the bus for several minutes, during which time she alternated between driving with one hand and at times releasing the steering wheel entirely to hold the food container. ECF No. 49-2 ¶ 52; ECF No. 61 ¶ 52. Plaintiff also notes that, at the time she was observed eating on the bus, she was alone and without any passengers, and had just left the bus garage to start her route. ECF No. 63 ¶ 12.

---

[4] When Plaintiff was initially confronted by her supervisor regarding the customer complaint, she was told that a customer had reported that a bus driver had been rude, but had identified a bus number that Plaintiff did not operate. ECF No. 63 ¶ 8; *see* ECF No. 49-2 ¶¶ 41–44. It does not appear that Plaintiff was investigated or disciplined for being rude in response to this complaint; rather, CT Transit initiated review of surveillance footage in response to the complaint and came upon unrelated footage of Plaintiff committing safety violations.

On March 26, 2024, Plaintiff was informed that CT Transit was conducting an investigation following a formal passenger complaint that she was observed eating a sandwich while on duty. ECF No. 52 ¶ 8.

On April 4, 2024, CT Transit informed Plaintiff that she had been observed violating multiple safety policies and issued a reminder that eating or drinking while operating a bus is prohibited. ECF No. 49-2 ¶ 53; Operator Coaching Form, ECF No. 49-7 at 37.[5] On April 8 or 9, 2024, Plaintiff met with her supervisor Kerisher Verrett, division manager Andrew Miranda, and union representative Godfrey Barton to discuss the March 5 distracted driving incident. ECF No. 49-2 ¶ 54; ECF No. 49-7 at 39; ECF No. 63 ¶ 17. During the meeting, Miranda asked Plaintiff to sign a document, which she refused to do. ECF No. 63 ¶¶ 16–17.[6] Plaintiff was also informed that she was suspended from her employment. ECF No. 49-2 ¶ 54.[7]

On April 10, 2024, Plaintiff was terminated during a meeting attended by Barton and Union President Veronica Chavers. ECF No. 49-2 ¶ 55. According to Plaintiff, Plaintiff was informed she was being terminated for violations of her Last Chance Agreement, ECF No. 61 ¶ 55, while CT Transit states Plaintiff was terminated for violation of the Last Chance Agreement "and distracted driving." ECF No. 49-2 ¶ 55. During the termination meeting, CT Transit showed video

---

[5] CT Transit's motion for summary judgment attaches as an exhibit a copy of an "operator coaching form" dated April 4, 2024, describing that Plaintiff "was coached on distract[ed] driving and reminded that eating or drinking [while] driving is not [permitted]" by a supervisor, Kerisher Verrett. ECF No. 49-7 at 37. The form further notes that Plaintiff "accepted her role in the violation and apologized for her actions," but is unsigned by Plaintiff. *Id.* Plaintiff denies the statement of fact regarding the April 4 communication, and states that "On April 14, 2024 the Plaintiff was informed by M[s]. Verrett not to eat while driving and M[s]. Verrett sent the plaintiff back to work." ECF No. 61 ¶ 53. However, Plaintiff later admits that she was terminated on April 10, 2024, before the date she alleges the conversation with Verrett occurred. ECF No. 61 ¶ 55.

[6] Plaintiff states that "Angel Miranda" requested that she sign a document at this meeting. ECF No. 59 at 3. There are no other references to "Angel Miranda" in the parties' motions or supporting exhibits. It appears Plaintiff was referring to CT Transit division manager Andrew Miranda.

[7] Plaintiff asserts that she was suspended for refusing to sign the document, ECF No. 63 ¶ 18, while CT Transit asserts Plaintiff was "inform[ed] she was being suspended pending an investigation into allegations that she failed to properly secure her seatbelt and consumed food while operating a bus," ECF No. 49-2 ¶ 54. The relevant Documentation of Disciplinary Action form indicates that Plaintiff was suspended pending investigation of "[f]ailure to properly secure seatbelt and eating while operating your vehicle." ECF No. 49-5 at 154.

of certain of Plaintiff's safety violations to Chavers and Burton, but apparently did not show Plaintiff the video. *Id.* ¶ 56; ECF No. 61 ¶ 56.

Plaintiff was then issued a termination letter dated April 10, 2024, stating that she engaged in "several violations of company policy" and that CT Transit's "policy on Operator Marie Cadet's Last Chance Agreement was violated by operator Cadet." ECF No. 49-7 at 39. A "Documentation of Disciplinary Action" form was also issued, noting that Plaintiff violated company policy as to "Attendance/Work Performance/Conduct" and "Violation of Last Chance Agreement/Distracted Driving Violation 4.26." ECF No. 49-7 at 41.[8] Plaintiff denies that she violated the Last Chance Agreement, as her conduct on March 5 involved eating on a bus and distracted driving but did not relate to cell phone use (the subject of the Last Chance Agreement). ECF No. 62 ¶ 11.

The Union filed a Step 1 grievance on Plaintiff's behalf on April 13, 2024. ECF No. 49-2 ¶ 58; ECF No. 52 ¶ 12. A Step 1 grievance meeting was held with Plaintiff, Chavers, Burton, and representatives of CT Transit. ECF No. 49-2 ¶ 59. CT Transit denied the grievance at Step 1, concluding that the termination was justified due to the distracted driving incident and Plaintiff's "long-standing history of severe and inexcusable safety issues that make her a true risk to the safety of herself and others." *Id.* ¶ 60; Step 1 Grievance Response, ECF No. 49-5 at 156. The Union appealed the denial and advanced the grievance to Step 2, asserting that the termination was wrongful because the Last Chance Agreement applied only to cell phone use; a Step 2 grievance meeting was held between Plaintiff, Chavers, Burton, and CT Transit's general manager. ECF No. 49-2 ¶¶ 61–62; ECF No. 52 ¶¶ 14–15. At both meetings, the Union represented Plaintiff's interests. ECF No. 52 ¶ 15. CT Transit denied the grievance at Step 2, concluding that Plaintiff's long-standing history of severe and inexcusable safety violations posed a risk to the safety of

[8] The form was incorrectly dated April 10, 2026, rather than April 10, 2024.

herself and others, and upholding her termination in light of the Last Chance Agreement and overall work record. ECF No. 49-2 ¶ 63; Step 2 Grievance Response, ECF No. 49-5 at 158.

C. The Union's Decision Not to Arbitrate

The Union, through President Chavers, sent a memorandum to all Union members on May 29, 2024, informing them that "we need to vote for an Arbitration in order to get [Plaintiff's] job back." Chavers Memo., ECF No. 50-6 at 2. While Plaintiff contends the Local 443 Bylaws do not establish a procedure for determining whether a grievance should proceed to arbitration, Chavers stated in her deposition that the ATU International Bylaws require such decisions to be submitted to membership for a vote. ECF No. 49-2 ¶ 65; ECF No. 61 ¶ 65.[9] The Union holds membership votes to determine whether grievances should proceed to arbitration as a matter of practice. *See* ECF No. 52 ¶ 23 ("Defendant Local 443 utilized the same method that the Union has used for all prior grievances being decided by the members on whether to proceed to arbitration."); ECF No. 49-2 ¶ 65. In her email, Chavers explained that she planned to present to the membership the facts of Plaintiff's case "and what we have to do to get Marie's job back," before a discussion among the members and a vote. ECF No. 50-6 at 2. Chavers further stated that "[a]rbitration will cost around 27,000.00 dollars, according to the lawyer. Each member will have to participate in these payments for our Union sister Marie." ECF No. 50-6 at 2.

Section 16 of the Union's Bylaws authorizes assessment of Union members for such purposes as it deems necessary by majority vote. ECF No. 49-2 ¶ 69.[10] During Chavers's tenure as union president, the Union has not paid for any arbitrations, however. ECF No. 63 ¶ 32; Chavers

[9] Neither Defendant filed a copy of the ATU International Bylaws in connection with its motion for summary judgment.

[10] Plaintiff also attests that, following Plaintiff's termination, Chavers informed her that the Union did not have the funds to bring her grievance to arbitration, and suggested that Plaintiff solicit funds from her colleagues to pay for the arbitration. ECF No. 63 ¶¶ 26–27.

Dep., ECF No. 50-11 at 94. Additionally, Ms. Chavers did not speak to a lawyer for Local 443, or any other lawyer, in arriving at the $27,000 figure. ECF No. 50-11 at 104–06. Instead, she asked representatives from other ATU locals for their lawyers' input on what the cost might be. *Id.*

At the Union's monthly membership meeting on June 5, 2024, the Union held a membership vote to determine whether Plaintiff's grievance should proceed to arbitration. ECF No. 52 ¶¶ 16–17. A quorum of Union members was present at the June 5, 2024, monthly meeting. *Id.* ¶ 18. Between 40 and 60 members attended the meeting, though the room where the meeting was held could not fit all of them. ECF No. 63 ¶ 33 (stating 40 members attended the meeting); Chavers Dep., ECF No. 50-11 at 90 (stating approximately 60 members attended); ECF No. 60 at 25 (letter from another union member stating more than 40 members were present). At the meeting, Chavers read Plaintiff's CT Transit personnel file to the members, Plaintiff addressed the group, and Union members asked questions and provided comments before a vote was taken. ECF No. 49-2 ¶ 72; ECF No. 52 ¶¶ 19–20. According to Plaintiff, while Plaintiff spoke to the group in support of proceeding to arbitration, Chavers interrupted her repeatedly, and when another member attempted to speak on Plaintiff's behalf, Chavers stated that Plaintiff would have to speak on her own behalf. ECF No. 61 ¶ 72; ECF No. 62 ¶ 19; ECF No. 60 at 25. According to Plaintiff, Chavers stated to the attendees that, regardless of the vote, Plaintiff would not be coming back to employment because Chavers was not going to support Plaintiff. ECF No. 63 ¶ 34; Pl's Aff., ECF No. 60 at 8, ¶ 33.

The majority of members voted by ballot against arbitrating Plaintiff's grievance, although members were not shown the results of the vote. ECF No. 52 ¶ 22; ECF No. 61 ¶ 73. After the meeting, a Union member who was present, Jose Dorvil, wrote a letter to the Union's national

office complaining about the Union's and Chavers's conduct. ECF No. 63 ¶ 38; *see also* ECF No. 60 at 25 (Dorvil's letter, requesting unidentified recipient to "confront the executive board members and President Chavers and hold them accountable").

D. Procedural History

Plaintiff filed her complaint in federal court in November of 2024, alleging one claim against both Defendants under § 301(a) of the Labor Management Relations Act. *See generally* ECF No. 1. Following discovery, both Defendants have moved for summary judgment, which Plaintiff opposes.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative

when it moves for summary judgment on an issue that the [non-movant] must prove at trial." *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001). "It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 248. If the non-movant fails "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## IV. DISCUSSION

For the reasons explained below, the Court concludes that Plaintiff has not established a genuine dispute of material fact as to whether CT Transit breached its CBA with the Union. Thus, summary judgment is appropriate as to both Defendants on Plaintiff's hybrid § 301 claim.

### A. Hybrid § 301/Duty of Fair Representation Claims

A plaintiff asserting a "hybrid" LMRA claim must demonstrate the employer's breach of a collective bargaining agreement as well as a breach of the duty of fair representation by the union. *See Balestracci v. Gen. Dynamics Corp.*, 221 F. Supp. 2d 258, 266 (D. Conn. 2002) (citing *DelCostello*, 462 U.S. at 163–65); *Carrion v. Enter. Ass'n, Metal Trades Branch Local Union*, 227

F.3d 29, 34 (2d Cir. 2000) (also citing *DelCostello*, 462 U.S. at 165). "The Union's breach is a prerequisite to consideration of the merits of plaintiff's claim against her former employer for improper discharge." *Young v. U.S. Postal Serv.*, 907 F.2d 305, 307 (2d Cir. 1990) (citing *DelCostello,* 462 U.S. 164–65). Thus, if a union member fails to establish a breach of the duty of fair representation by the union, the Court need not address the employer's breach of the CBA. *Amaty v. Int'l Org. of Masters, Mates & Pilots, ILA, AFL-CIO, Atl. Marine Grp.*, No. 3:18-CV-741 (AWT), 2020 WL 3105529, at *5 (D. Conn. Feb. 25, 2020) (citing *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 183 & n.3 (2d Cir. 2001)). "The converse is also true—that is, in a hybrid claim, if the employer is not liable to the employee, neither is the union." *Acosta v. Potter*, 410 F. Supp. 2d 298, 309 (S.D.N.Y. 2006) (citing *DelCostello*, 462 U.S. at 165).

B. Exhaustion of Administrative Remedies

First, the Court concludes that the Union has failed to sustain its burden of demonstrating Plaintiff failed to exhaust available administrative remedies.

The Union contends that, because Plaintiff failed to file an appeal with the International Amalgamated Transit Union (the "International Union"), she has failed to exhaust available administrative remedies. *See* Union Memo. in Supp. of Mot. for Summ. J., ECF No. 50-1 at 14–15. Generally, an employee's failure to exhaust internal union appeals procedures is an affirmative defense to the claim that a union breached its duty of fair representation. *See Clayton*, 451 U.S. at 683–84. This requirement is not mechanically applied in every case, however. "[W]here an internal union appeals procedure cannot result in reactivation of the employee's grievance or an award of the complete relief sought in his § 301 suit, exhaustion will not be required with respect to either the suit against the employer or the suit against the union." *Id.* at 685.

Courts have discretion over whether to require exhaustion of internal union appeals procedures before a member may sue their employer or union under § 301. *Id.* at 689. In

exercising this discretion, at least three factors are relevant: "first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim." *Id.*

"[T]he burden of establishing entitlement to the exhaustion defense lies with the Union," which "is in a better position than the employee to inform the court of the efficacy and fairness of these appellate remedies." *Johnson v. Gen. Motors*, 641 F.2d 1075, 1079 (2d Cir. 1981). The Union must prove that its appellate procedures (1) "can be administered in a sufficiently unbiased manner to guarantee that the employee's resort to them would not be futile"; (2) are adequate such that "the disgruntled employee can be fully redressed for his injuries resulting from the Union's alleged breach"; and (3) are reasonable, "which can be demonstrated by showing that Union members have been informed of the availability of internal appellate remedies and that these procedures are not particularly cumbersome or confusing." *Id.* at 1079–80; *see also Patrick v. Loc. 51, Am. Postal Workers Union*, AFL-CIO, No. 19-CV-10715 (NSR), 2020 WL 703392, at *3–4 (S.D.N.Y. Feb. 11, 2020).

Here, the complaint alleges that Plaintiff has "exhausted any internal union remedies that could possibly have obtained any effective relief" and that "the union constitution does not provide effective remedies and further exhaustion would be futile." ECF No. 1 ¶ 18. At summary judgment, Plaintiff does not make any showing that she attempted to appeal Local 443's decision with the International Union; nor does she offer facts substantiating her allegation that such

exhaustion would have been futile.[11] But it is the Union's duty to inform the Court of the fairness, reasonableness, and adequacy of its procedures if it wishes to take advantage of the exhaustion defense. *See Johnson*, 641 F.2d at 1079. Here, the Union points only to the fact that Plaintiff did not file an appeal with the International Union, without elaborating on any of the relevant factors. It has thus clearly failed to carry its burden on this affirmative defense, and the Court will excuse any failure to exhaust.

C. <u>Breach of the Duty of Fair Representation</u>

Next, the Court concludes that Plaintiff has demonstrated a genuine issue of material fact about whether the Union breached its duty of fair representation.

A union has a statutory duty to fairly represent its employees, both in its collective bargaining with the employer "and in its enforcement of the resulting collective bargaining agreement." *Vaca*, 386 U.S. at 177. A union breaches the duty of fair representation "when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Sanozky v. Int'l Ass'n of Machinists and Aerospace Workers*, 415 F.3d 279, 282 (2d Cir. 2005) (quoting *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998)).

*1. Arbitrary, Discriminatory, or Bad Faith Conduct*

The Court concludes that there is a genuine dispute of material fact concerning whether the Union acted in bad faith in voting against proceeding with arbitrating Plaintiff's grievance.

In general, a union "may not, without a legitimate purpose, take action favoring some of its members at the expense of others." *Ramey v. Dist. 141 Int'l Ass'n of Machinists & Aerospace*

---

[11] Instead, Plaintiff merely notes that the Union did not attach the relevant provisions of the International Union's constitution to its motion. ECF No. 59 at 22–23. Plaintiff is correct on this point: the Union did not attach the correct pages of the International's Constitution to its motion for summary judgment, though it rectified this error in reply. *See* Excerpt of Int'l Union Const., ECF No. 66-1. The Court finds that the Union did not waive the exhaustion argument, because it was substantively addressed in the Union's moving papers, despite this oversight. As discussed, the argument fails on the merits.

*Workers*, 378 F.3d 269, 277 (2d Cir. 2004) (citation omitted). A union breaches its duty of fair representation if its actions with respect to a member are "arbitrary, discriminatory, or taken in bad faith." *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 388 (2d Cir. 2015).[12] "'To survive a motion for summary judgment on this issue, a plaintiff must set forth concrete, specific facts from which one can infer a union's hostility, discrimination, bad faith, dishonesty, or arbitrary exercise of discretion.'" *Barton v. City of Bristol*, 294 F. Supp. 2d 184, 202 (D. Conn. 2003) (quoting *Rennie v. Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union,* 38 F. Supp. 2d 209, 215 (D. Conn. 1999)).

A union's actions "are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness . . . as to be irrational." *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (quotation marks and citation omitted). Although Plaintiff alleged in her complaint that the Union acted arbitrarily in deciding not to pursue her grievance in arbitration, *see* ECF No. 1 ¶¶ 15–17, her summary judgment briefing contends only that the Union discriminated against her and acted in bad faith, *see* Opp. to Mot. for Summ. J., ECF No. 59 at 14 ("The Union in the instant case discriminated against and acted in bad faith when it decided not to pursue arbitration on behalf of the Plaintiff."). And the record does not support that the Union's behavior was irrational—particularly when the review of its actions must be "highly deferential." *O'Neill*, 499 U.S. at 78.

[12] Older Second Circuit case law held that "before a union can be charged with arbitrary or discriminatory action, it must be shown that the union acted in bad faith." *Simberlund v. Long Island R. Co.*, 421 F.2d 1219, 1225 (2d Cir. 1970). As the Court concludes Plaintiff has shown a genuine dispute of material fact about whether the union acted in bad faith, it need not decide whether bad faith is a prerequisite to a showing of arbitrary or discriminatory action. In any event, however, more recent Second Circuit cases have framed arbitrariness, discriminatory actions, and bad faith as separate means for establishing the first element of a breach of a duty of fair representation claim, without bad faith serving as a prerequisite for a finding of arbitrariness or discriminatory actions. *See Fowlkes*, 790 F.3d at 388; *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998).
.

Accordingly, Plaintiff has not demonstrated a genuine issue of material fact about whether the Union acted arbitrarily.

Nor could a reasonable jury conclude that the Union's conduct was discriminatory. Plaintiff makes only conclusory statements that the Union acted in a discriminatory manner, and does not point to any facts that would support an inference of discrimination. "Discrimination demands a desire to act or retaliate based on impermissible classifications." *Camelio v. Int'l Bhd. of Teamsters*, 32 F. Supp. 3d 427, 431 (W.D.N.Y. 2014); *see also Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 704, 709 (2d Cir. 2010) ("A union's acts are discriminatory when 'substantial evidence' indicates that it engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives.'") (quoting *Amalgamated Ass'n of St., Elc. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 301 (1971)). Plaintiff has not identified any "impermissible classifications" that may have been applied to her, much less discrimination that was intentional, severe, or unrelated to legitimate union objectives.

But Plaintiff has demonstrated a genuine dispute of material fact about whether the Union acted in bad faith. A union acts in bad faith when it acts "with an improper intent, purpose or motive." *Spellacy*, 156 F.3d at 126. "Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct." *Id.* To survive a motion for summary judgment, a plaintiff must set forth "concrete, specific facts from which one can infer . . . bad faith." *Barton*, 294 F. Supp. 2d at 202 (quoting *Rennie*, 38 F. Supp. 2d at 215). "'Conclusory allegations without supporting facts demonstrating the union's lack of good faith fail to show a valid claim.'" *Id.* (quoting *Rennie*, 38 F. Supp. 2d at 215).

A reasonable jury could conclude that President Chavers's actions prior to and during the Union meeting were taken in bad faith. In the memorandum notifying Union members that a vote

would be held regarding Plaintiff's case, President Chavers stated, on behalf of the Union, that "[a]rbitration will cost around 27,000.00 dollars, according to the lawyer. Each member will have to participate in these payments for our Union sister Marie." ECF No. 50-6 at 2. Section 16 of the Union's Bylaws authorizes assessment of Union members for such purposes as it deems necessary by majority vote. Local 443 Bylaws, ECF No. 50-5 at 12. But, as Plaintiff points out, Section 16 is not explicitly triggered by the Union's decision to proceed a grievance to arbitration. ECF No. 61 ¶ 68. In her deposition, President Chavers clarified that, if the membership voted to proceed to arbitration, the Union would have held a separate vote to determine how much money to assess from each member's paychecks in order to pay for it. ECF No. 50-11 at 71–74 (indicating that a vote in favor of arbitration activates the assessment provision in the Union's Bylaws, requiring a second vote to determine the specific assessment amount to be deducted from each member's paycheck). But Chavers's May 29, 2024, memorandum did not indicate that Union members would have input in the decision to levy assessments or the amount of such assessments. *See* ECF No. 50-6 at 2. Nor did it offer further details about how the payments would be collected, or how much each individual member would have to pay. *Id.* With respect to the meeting where Union members voted on whether to proceed with arbitration of Plaintiff's grievance, there is no indication that the Union members received clarification about the second-round voting procedure for authorizing assessments during this meeting. Further, the memorandum stated that the $27,000 figure was provided by "the lawyer," suggesting that Local 443's lawyer had offered a cost estimate based on the facts of the case. *Id.* But Chavers did not speak to a lawyer for Local 443, nor did she speak directly to any other lawyer to arrive at this figure. In her deposition, she indicated that she spoke to "ATU locals all around" and asked them to ask their lawyers for a cost

estimate. ECF No. 50-11 at 104–06. The other locals "had those same arbitrations," and were given an estimate of $27,000. *Id.*

A reasonable jury could infer from these facts that the Union's decision not to proceed with arbitration of Plaintiff's grievance was taken in bad faith. A "fail[ure] to investigate relevant information" may support a finding that a union's conduct was arbitrary, discriminatory, or in bad faith. *See Dimps v. Taconic Corr. Facility*, No. 17-CV-08806, 2019 WL 1330957, at *4 (S.D.N.Y. Mar. 25, 2019), *aff'd in part,* 802 F. App'x 601 (2d Cir. 2020). The $27,000 figure Chavers invoked in her May memorandum was not based in any analysis of the costs of arbitrating Plaintiff's particular case. Chavers's own deposition testimony indicates that her process in arriving at the $27,000 estimate was entirely divorced from the facts of Plaintiff's grievance, and there is no indication that Chavers investigated whether other locals' costs would align with Local 443's. And as described above, Chavers's memorandum omitted relevant information about the procedure for voting on whether to levy assessments on members' paychecks, and if so, the amount of such assessments. Chavers also apparently failed to educate Union members about the assessment procedure at the June 5 meeting. *See* ECF No. 60 at 25 (letter from Jose Dorvil stating that many members were specifically "present to vote yes or no for arbitration, as they feared an absence may have resulted in agreeing to an increase of the union dues to pay for the arbitration . . . [s]ome members just wanted to hear about the financial status of the local," but "[t]hat was not addressed"). And because the Union had not paid for an arbitration since at least 2015, ECF No. 50-11 at 94, it is reasonable to infer that at least some Union members were unfamiliar with the procedure for authorizing assessments, and attended the meeting to vote against arbitration out of concern that their checks would be garnished without their input.

Thus, there is at least a question of fact as to whether Chavers intentionally misled Union members concerning the $27,000 estimate and its effect on members' paychecks. A reasonable jury could conclude that Chavers's provision of the cost estimate for arbitration that was not tethered to Plaintiff's particular case, along with her creation of the impression that Union members would have to pay such costs out of pocket—and the accompanying failure to correct that impression—was deceitful and intentionally misleading.[13]

*2. Causation*

In addition to showing that the union acted arbitrarily, discriminatorily, or in bad faith, a plaintiff advancing a claim that her union breached its duty of fair representation must also show that any damages she suffered were "caused by the union's breach." *Sanozky*, 415 F.3d at 283; *see also Spellacy,* 156 F.3d at 126 ("Establishing that the union's actions were sufficiently 'arbitrary, discriminatory or in bad faith,' is only the first step toward proving a fair representation claim. Plaintiffs must then demonstrate a causal connection between the union's wrongful conduct and their injuries.").

[13] Additionally, Chavers allegedly told Union members at the meeting that, regardless of the vote, Plaintiff would not be going back to work because Chavers did not support her, evincing possible personal animus against Plaintiff. ECF No. 63 ¶ 34. By contrast, Plaintiff's other allegations regarding Chavers's conduct do not support a finding that she acted in bad faith. First, Plaintiff's opposition to the motion for summary judgment asserts that she sent a letter to the ATU International complaining about Chavers's conduct in February of 2023. ECF No. 59 at 21. Plaintiff attaches a copy of the purported letter as an exhibit, Complaint Letter, ECF No. 60 at 28, but Plaintiff's affidavit does not affirm that this letter was ever sent, or, if it was sent, to whom. *See* ECF No. 60 at 2–14 (Plaintiff's affidavit, which does not mention the letter). Chavers disputes having ever received a copy of this letter or being aware of its contents, ECF No. 50-11 at 98–99, as may have supported an inference of retaliatory motive. Second, the fact that the June 5 meeting room was not large enough to accommodate the attendees does not demonstrate bad faith: Chavers noted in her deposition that the Union made sure everyone was able to hear the proceedings and had the opportunity to vote, and Plaintiff does not dispute this assertion. *Cf.* ECF No. 60 at 8 (Plaintiff's affidavit, stating that Union members who could not fit in the room had to stand in the hallway); *id*. at 25 (letter from Jose Dorvil asserting that the voting room was hot and humid and some members had to stand in the hallway, and that "some members left without voting," but not representing that any member was unable to hear or unable to vote). There is no indication that the proceedings were held in a different room than was typical, and Chavers stated in her deposition that the vote took place in the union office, with the hallway available for overflow, "like we always do for every arbitration and every meeting." ECF No. 50-11 at 89–90.

Neither Defendant argues that Plaintiff has failed to demonstrate a material fact about causation here. Accordingly, the Court does not address it further.

D. Breach of Collective Bargaining Agreement

Even though Plaintiff has shown a genuine dispute of material fact with respect to the duty of fair representation portion of her hybrid § 301/duty of fair representation claim, no reasonable juror could find that CT Transit breached the CBA when it terminated Plaintiff. Plaintiff argues that CT Transit violated the CBA because it terminated her employment without just cause, but the CBA and Discipline Code for Bus Operators clearly establish that rule violations like those committed by Plaintiff may provide good cause for termination. Accordingly, Defendants are entitled to summary judgment.

*1. Termination for Cause under the CBA*

The CBA provides that "[n]o employee may be discharged except for cause." ECF No. 49-5 at 96. While the CBA itself does not define "cause," it undisputedly provides that CT Transit the "exclusive right to set its policy," including to make regulations governing employee conduct, to enforce discipline for violation of rules and other misconduct, and to "suspend or discharge its employees for cause." ECF No. 49-5 at 14. Accordingly, the Court looks to CT Transit's policies, specifically the Discipline Code for Bus Operators to guide its understanding of "cause."

CT Transit's Discipline Code for Bus Operators clearly allows for the exercise of discretion and holistic review of an employee's disciplinary record in determining discipline, up to and including termination. The Discipline Code sets forth only one statement elucidating CT Transit's definition of "cause": "[M]ajor or willful infraction of rules and/or instructions or the continued necessity to administer discipline shall be sufficient *cause* for the discharge of any employee." ECF No. 49-6 at 143 (emphasis added).

As described above, the Discipline Code sets forth categories of rule violations for which discipline may be imposed, and provides for generally progressive discipline for violations of the regulations for operation of transit buses. Violations are assigned a "category" number based on their severity; a certain number of violations in each category generally results in termination. ECF No. 49-6 at 143–146 (noting, for example, that termination will normally occur after one Category 1 violation, one or two Category 2 violations, three or four Category 3 violations, and four or five Category 4 violations).

The Discipline Code does require rigid adherence to these categories of discipline, however. It indicates that bus operators may face discipline, "up to and including discharge," for actions not specifically listed in the Discipline Code if they are "detrimental to the mission of CT Transit." ECF No. 49-6 at 143. Likewise, the Discipline Code repeatedly emphasizes that discipline is to be subject to employer discretion where appropriate. *See* ECF No. 49-6 at 142 ("This code is designed to serve as a guide to employees and management for the purpose of ensuring that disciplinary matters are handled consistently and fairly . . . [but] is not intended to impose a rigid limitation on management when dealing with disciplinary matters . . . the employee's total record will be considered before determining any penalty. For violations of multiple rules occurring during the same time period, penalties will be determined at the discretion of management."); *id.* ("employees will normally be subject to increasingly severe penalties up to and including discharge for . . . overall poor performance including violations of two or more rules or regulations."). Discretion is particularly relevant in the case of Category 3 or Category 4 violations, where a supervisor may distinguish between a violation meriting suspension and a violation meriting termination. *See id.* at 145–46.

2. *Policy Violations*

As described above, Plaintiff was disciplined for several safety violations between October of 2023 and her first termination in December of 2023. These include two Category 2 violations, one Category 3 violation, and three Category 4 violations. Then, after Plaintiff was reinstated pursuant to a Last Chance Agreement, she was observed via surveillance footage committing other safety violations on March 5, 2024. The March 5 incident included conduct constituting at least one Category 4 violation (not wearing a seatbelt) and one Category 3 violation (eating while operating the bus),[14] for a total of at least two Category 2 violations, two Category 3 violations, and four Category 4 violations.

As an initial matter, Plaintiff's denial that she committed any of the violations in 2023 or received the relevant violation reports does not create a genuine dispute of material fact about whether she was terminated for cause, as required by the CBA. *See* ECF No. 61 ¶¶ 28–37. Plaintiff does not offer any explanation for how she accrued multiple violation reports without committing any of the infractions. Plaintiff does, however, assert that the violation reports issued in 2023 were signed by Supervisor Jean Florian, an individual whom Plaintiff had previously accused of sexual harassment.[15] Plaintiff apparently suggests, but does not explicitly claim, that

[14] The Court notes that some of CT Transit's characterizations of Plaintiff's conduct are not fully supported by the documentary evidence submitted. For example, CT Transit claims that Plaintiff changed her shoes while driving, constituting a Category 4 violation (failure to wear a proper uniform). But the Discipline Code explicitly refers to "[g]arments which you furnish such as . . . shoes," indicating that shoes are not actually part of the "uniform" referenced in Category 4, Line 11. ECF No. 49-6 at 91. Changing shoes may constitute distracted driving or failure to observe rules of safe and courteous bus operation, however. Regardless, the propriety of Plaintiff's termination for cause does not depend on the violation category into which changing shoes while driving may fall.

[15] Plaintiff also asserts that Mr. Florian was terminated in relation to sexual harassment allegations, and asserts that Chavers confirmed as much in her deposition. But Chavers denied such knowledge. *Compare* ECF No. 59 at 25–26 ("Even the union president Ms. Chavers recalls the supervisor, Mr. Florian, being discharged due to sexual harassment.") (citing Chavers Dep., ECF No. 50-11 at 38) *with* ECF No. 50-11 at 38–40 (Chavers stating she had "hear[d] about Ms. Cadet raising an issue about sexual harassment . . . concerning the conduct of Mr. Florian," but did not know whether Mr. Florian was separated from employment as a result of misconduct).

the violation reports were issued falsely or in retaliation for her harassment complaint against Florian.

To the extent Plaintiff attempts to create a genuine issue of material fact at summary judgment relating to the accuracy of her 2023 violation reports, her allegations regarding Mr. Florian do not suffice. First, these facts and apparent retaliation theories have not previously been raised, and thus may not be properly considered. "[T]he law is clear that a party may not raise a new legal theory or factual allegation for the first time on summary judgment." *Sound Around, Inc. v. Friedman*, No. 24-CVL-986 (DLC), 2026 WL 972984, at *11 (S.D.N.Y. Apr. 10, 2026) (declining to reach the merits of an argument that was raised for the first time on summary judgment) (citing *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006), *appeal filed* May 11, 2026; and *Montesa v. Schwartz*, 836 F.3d 176, 191 n.1 (2d Cir. 2016) (declining to consider an allegation that appeared for the first time in the plaintiffs' brief)); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (recognizing that a party may not amend its claims in opposition briefing to a motion).

Further, even if the Court were to consider these allegations, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). Plaintiff does not include any documentation besides her own affidavit substantiating the new allegation that she accused Florian of sexual harassment. *See* ECF No. 60 at 11 ¶ 42. And any suggestion that Florian falsely issued disciplinary violation reports in response to Plaintiff's accusation is conjecture and inadmissible absent evidence creating a causal connection between Plaintiff's accusation and the disciplinary reports. *See Freeman v. Goord*, No. 02-CV-9033 (PKC), 2005 WL 3333465, at *7 (S.D.N.Y. Dec. 7, 2005) ("Conclusory allegations of retaliatory motivation are, of course, insufficient to withstand

a motion for summary judgment."); *Cortese v. Skanska Koch, Inc.*, 544 F. Supp. 3d 456, 472 (S.D.N.Y. 2021) (disregarding speculative testimony at summary judgment because it "would not be admissible in evidence" under Fed. R. Civ. P. 56(c)(2)). Because Plaintiff offers no substantiated explanation for the alleged falsity of the 2023 reports, and does not otherwise object to the veracity of the documentation of her 2023 violations, the Court disregards Plaintiff's assertions that she did not commit such violations.

With respect to the March 2024 violations, Plaintiff does not appear to dispute that Plaintiff failed to fasten her seat belt before the bus was in motion, ECF No. 61 ¶ 48; and that she is depicted on video operating the bus with only one hand or no hands on the steering wheel at various times, *id.* ¶¶ 49–50; pulling and holding her seatbelt while the bus was in motion, *id.* ¶ 51; and eating while operating the bus, during which she alternated between driving with one hand and, at times, releasing the steering wheel entirely to hold the food container, *id.* ¶ 52.

On the record before the Court, no reasonable jury could conclude that Plaintiff did not commit various violations of CT Transit's Discipline Policy.

*3. Plaintiff's Termination For Cause*

Finally, the evidence in the record establishes that CBA and Discipline Code afford CT Transit wide latitude to discipline employees, such that Plaintiff was not terminated in violation of the CBA.

The Discipline Code, and by extension the CBA, permits termination for these violations. First, the Discipline Code contemplates termination for four Category 4 violations within a span of 12 months, such that the March 2024 violations alone could have supported Plaintiff's termination under the Discipline Code. ECF No. 49-6 at 146 ("A fourth violation within 12 months will result in suspension and final warning or possible discharge."). Second, the Discipline Code does not require CT Transit to consider only one category of violations at a time: the policy clearly

contemplates "penalties up to and including discharge" for "violations of two or more rules or regulations," with no qualifiers for the category of the violations. *Id.* at 142. Third, the Discipline Code does not require strict adherence to the enumerated disciplinary responses; rather, it explicitly provides that "the employee's total record will be considered before determining any penalty," and that "continued necessity to administer discipline shall be sufficient cause for . . . discharge." *Id.* at 142–43. CT Transit's position that Plaintiff's distracted driving posed a safety risk is well-documented. *See* ECF No. 49-7 at 2, 4, 9, 11, 13, 15; ECF No. 49-5 at 150, 158.

The fact that Plaintiff was informed she was being terminated for violations of the Last Chance Agreement—which was related to cell phone use—in addition to distracted driving does not change this result. To be sure, Plaintiff's Last Chance Agreement did not explicitly provide for her termination in any scenario other than future infractions of the cell phone policy. ECF No. 49-7 at 17 ("[a]ny future violation of Company rules regarding cell phones will result in immediate termination."). Plaintiff could not have been terminated for violations of the Last Chance Agreement, as she had not violated the cell phone policy since the date of the Agreement; accordingly, references to violations of the Last Chance Agreement during Plaintiff's termination meeting and in documentation of her termination do not support good cause.

This does not mean that Plaintiff was not terminated for cause, however. Plaintiff's termination letter and Documentation of Disciplinary Action form both reference termination for "distracted driving," and the termination letter describes "several violations of company policy." ECF No. 49-7 at 39, 41. Even though CT Transit wrongfully stated Plaintiff had violated the Last Chance Agreement, it also contemporaneously found that Plaintiff had committed other violations. Upon Step 1 and Step 2 review, CT Transit officials found that the termination was warranted based on Plaintiff's patterns of safety violations over time. ECF No. 49-5 at 156, 158.

Accordingly, CT Transit offered an independently sufficient just cause-based rationale for Plaintiff's termination that did not involve the Last Chance Agreement. The Court agrees with CT Transit that, on this record, "considering Plaintiff's extensive disciplinary history . . . combined with her repeated engagement in dangerous distracted driving, CT Transit . . . had ample and independent just cause to terminate her employment." CT Transit Memo. in Supp. of Mot. for Summ. J., ECF No. 49-1 at 22. No reasonable jury could conclude otherwise. *See Saluja v. Local 1199 United Healthcare Workers East*, No. CV-06-5051 (SJF) (ARL), 2007 WL 3232475, at *1 (E.D.N.Y. Nov. 1, 2007) (defining "just cause" as requiring the employer to "prove that its discipline or discharge decision is justified by the employee's unsatisfactory performance or misconduct").

Therefore, because a plaintiff must establish genuine disputes of material fact on both a breach of the duty of fair representation by her union *and* the employer's breach of the CBA in order to survive summary judgment on a hybrid § 301/duty of fair representation claim, and Plaintiff has not shown such disputes with respect to whether CT Transit breached the CBA, Defendants are entitled to summary judgment. *See DelCostello*, 462 U.S. at 163–65; *Acosta*, 410 F. Supp. 2d at 309 ("in a hybrid claim, if the employer is not liable to the employee, neither is the union").

## V. CONCLUSION

For the reasons described herein, the Court GRANTS Defendants' motions for summary judgment, ECF Nos. 49 and 50. The Clerk is directed to enter judgment for Defendants and close this case.

**SO ORDERED** at Hartford, Connecticut, this 30th day of September, 2026.

*/s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE